1

2

3

4                          UNITED STATES DISTRICT COURT

5                              DISTRICT OF NEVADA

6    STEVEN FLOYD VOSS,                        3:14-cv-00066-RCJ-WGC

7                              Plaintiff,      **REPORT & RECOMMENDATION OF
                                               U.S. MAGISTRATE JUDGE**
8          v.

9    ISIDRO BACA, et. al.,

10                            Defendants.

11

12         This Report and Recommendation is made to the Honorable Robert C. Jones, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15   Plaintiff's Motion for Partial Summary Judgment (Doc. # 39)[1], to which Defendants filed an

16   Opposition (Doc. # 73) and Cross-Motion to Dismiss Plaintiff's ADA and RA Claims

17   (Doc. # 74).[2] Plaintiff filed a reply in support of his motion (Doc. # 83) as well as a response to

18   Defendants' cross-motion (Doc. # 85). Defendants filed a reply in support of their cross-motion.

19   (Doc. # 89.)

20         Also before the court is Defendants' Motion for Summary Judgment as to Counts III and

21   IV of Plaintiff's Complaint. (Doc. # 117.) Plaintiff filed a response to this motion (Doc. # 126)

22   and Defendants filed a reply (Doc. # 127)

23         After a thorough review, the court recommends that: (1) Plaintiff's Motion for Partial

24   Summary Judgment (Doc. # 39) be denied; (2) Defendants' Cross-Motion to Dismiss Plaintiff's

25

26   _____

27         [1] Refers to court's docket number.

28         [2] Docs. # 73 and # 74 are identical, but were docketed separately to reflect that Defendants filed both an
     opposition to Plaintiff's motion as well as their own cross-motion to dismiss.

ADA and RA  Claims (Doc. # 74) be denied; and (3) Defendants' Motion for Summary

Judgment as to Counts III and IV (Doc. # 117) be granted.

# I. BACKGROUND

**A. Parties and Claims**

Plaintiff, a pro se litigant, is a prisoner in the custody of the Nevada Department of

Corrections (NDOC), and brings this action pursuant to 42 U.S.C. § 1983, the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12131, *et. seq.,* and the Rehabilitation Act (RA), 29 U.S.C.

§ 794. (Pl.'s Compl., Doc. # 20.) The events giving rise to this action took place while Plaintiff

was housed at the Northern Nevada Correctional Center (NNCC). (*Id.*) Defendants are NDOC

Director Greg Cox, NDOC Deputy Director E.K. McDaniel, NNCC Warden Isidro Baca, NNCC

Associate Warden Ron Schreckengost, NNCC Associate Warden Lisa Walsh, NNCC

Correctional Case Specialist II William Humphrey, NNCC Correctional Case Specialist II

Shannon Moyle, and Monica Navarro. (Doc. # 20 at 2-3; Screening Order, Doc. # 19.)

On screening, Plaintiff was allowed to proceed with the following claims: (1) claims for

violation of the ADA and RA in Count I against Cox, McDaniel, Baca, Shreckengost, Walsh and

Moyle; (2) a retaliation claim in Count II against defendants Humphrey, Walsh, Navarro, and

Moyle; (3) a claim for denial of access to the courts in Count III against defendants Walsh,

Navarro, Baca and McDaniel; and (4) an access to courts claim against defendant Humphrey in

Count IV. (Doc. # 19 at 3-7.)

The court dismissed with prejudice Plaintiff's Fourteenth Amendment due process claim

in Count I, and Count V was dismissed as duplicative of Counts III and IV. (Doc. # 19 at 4-5, 7-

8.)

In Count I, Plaintiff alleges that on March 4, 2013, NNCC initiated the institutional level

system (governed by Operational Procedure (OP) 516), consisting of three levels. (Doc. # 20 at

5-6.) Plaintiff claims he has a qualified disability within the meaning of the ADA, and that his

medical records demonstrate that he is regarded as having such disability. (*Id.* at 6.) He alleges

that his medical classification and medical restrictions render him ineligible for any prison work

assignment within NDOC, which systematically precludes him from advancing within the

1   institutional levels. (*Id*. at 6) He avers that he can never advance to level one status and benefit

2   from the programs, activities, benefits and privileges enjoyed by level one's inmates because a

3   prerequisite to level one status is the ability to hold a work assignment. (*Id*. at 6-7.) He avers that

4   these benefits and privileges include exercise facilities, hobby craft, a music program, and the

5   inmate coffee shop. (*Id*. at 8.) He also mentions that his conviction which resulted in his

6   confinement within NDOC does not impose any work requirement; therefore, NDOC may not

7   impose such a requirement upon him. (*Id*. at 9.)

8        In Count II, Plaintiff alleges that prison officials changed his housing assignment from

9   Unit 10-B to Unit 2-C in anticipation of the implementation of the institutional level system. (*Id.*

10   at 10.) On March 4, 2013, when NNCC implemented the system, Unit 10 was converted into a

11   level one housing unit, and Unit 2 was converted to a level three housing unit. (*Id.*) Plaintiff was

12   assigned to level three; then, on July 25, 2013, Unit 2 was upgraded to level two status along

13   with Plaintiff. (*Id.*) Plaintiff was then assigned to level three again on September 10, 2013. (*Id.* at

14   11.) He asserts that this occurred after he had a meeting with Walsh and Navarro, who had

15   assured him that he would not receive a level reduction absent a write-up. (*Id.*) Plaintiff did not

16   receive a write-up but nevertheless had his level reduced. Plaintiff alleges the level reduction was

17   retaliatory because he had filed grievances (2006-29-58159 and 2006-29-670049) challenging

18   the institutional level system, and alleging that Humphrey had inappropriately approached him

19   about a grievance alleging misconduct against Humphrey. (*Id*. at 11-12.) Plaintiff had reported

20   this incident to Walsh, who assured Plaintiff there would be no retaliation. (*Id*. at 12.)

21   Nonetheless, the incident was brought to the attention of Humphrey's supervisor, Moyle, who

22   had admonished Plaintiff regarding his comments. (*Id*. at 12.13.) As indicated above, the court

23   construed this as stating a retaliation claim against Walsh, Navarro and Moyle.

24        In Count III, Plaintiff alleges that he submitted a grievance on March 5, 2013, and on

25   March 27, 2013, Walsh returned the grievance to Plaintiff as improper because Plaintiff did not

26   attach proof of his attempts to informally resolve his grievance claims with his caseworker. (*Id.*

27   at 17.) He resubmitted the grievance with proof of his efforts to informally resolve the issue, and

28   a response should have been forthcoming by May 10, 2013. (*Id*.) He did not receive a response

by May 10, 2013, and so he submitted his first level grievance on that date, with a response due by June 24, 2013. (*Id.* at 17-18) On May 21, 2013, Plaintiff received a response to the resubmitted informal level grievance. (*Id.* at 18.) Plaintiff informed the responder that because the response was overdue, he had already sent in his first level grievance, and the caseworker instructed Plaintiff to resubmit the first level grievance, which he did. (*Id.*) Plaintiff claims that this did not extend the time for them to respond to the initially-submitted first level grievance, but he nevertheless waited until July 10, 2013 to submit his second and final level grievance. (*Id.* at 19.) On August 19, 2013, his first level grievance was returned as improper, asserting that Plaintiff failed to attach his informal level grievance response. (*Id.*) The second level grievance was also returned as improper on the basis that the first level grievance has been returned as improper. (*Id.* at 19-20.) On August 22, 2013, Plaintiff re-submitted the first level grievance to Walsh during a conference with her and Monica Navarro. (*Id.* at 20.)

Plaintiff avers that Walsh and Navarro told him that they were intentionally delaying the grievance process for claims involving the institutional level system because they were trying to "iron-out wrinkles in the level system." (*Id.*) Plaintiff alleges that this delay impeded his ability to exhaust his administrative remedies and file a claim. (*Id.*)

In Count IV, Plaintiff alleges that on August 20, 2013, prior to submitting his informal level grievance (number 2006-29-67049), he attempted to informally resolve his claims with his caseworker, defendant Humphrey, to attach to his informal level grievance. (*Id.* at 24.) He claims that he gave Humphrey an inmate request form where he asked Humphrey to acknowledge his attempts to informally resolve his claims, but Humphrey refused to provide this acknowledgement. (*Id.* at 24-25.) Humphrey admitted Plaintiff could not have his grievance accepted without proof of trying to informally resolve the issues, and that Plaintiff had to exhaust his administrative remedies prior to filing suit. (*Id.* at 25.)

**B. Plaintiff's Motion for Partial Summary Judgment Re: Claims I and III (Doc. # 39)**

Plaintiff moves for partial summary judgment as to his claims in Counts I and III. (Doc. # 39.)  First, Plaintiff asserts that his medical records demonstrate that he is a person with a qualified disability or is regarded as having a qualified disability by NDOC insofar as his claims

1    under the ADA and RA are concerned. (Doc. # 39 at 20-21, 38.) He contends that due to his

2    medical classification, he is ineligible for any work assignment within NDOC which precludes

3    him from advancing to level one status and enjoying the benefits afforded to level one inmates.

4    (*Id*. at 21, 39.) Second, with respect to Count III, he argues that he has sufficiently exhausted his

5    administrative remedies and is entitled to summary judgment on this issue. (*Id*. at 28-36, 41-57.)

6    **C. Defendants' Response and Cross-Motion to Dismiss Plaintiff's ADA & RA Claims**

7    **(Docs. # 73/74)**

8           Defendants oppose Plaintiff's partial motion for summary judgment, and move to dismiss

9    Plaintiff's ADA and RA claims. (Docs. # 73/74.) In response to Plaintiff's motion, Defendants

10   dispute that Plaintiff cannot work due to his medical classification. With respect to Count III,

11   Defendants acknowledge that Plaintiff exhausted his administrative remedies as to his ADA and

12   RA claims, but argue that at a minimum, a genuine dispute of material fact exists as to whether

13   Plaintiff suffered actual injury because he was able to file this lawsuit within the statute of

14   limitations. Finally, they argue that Walsh did not abuse the grievance process.

15          In their cross-motion to dismiss Plaintiff's ADA and RA claims, Defendants argue that

16   Plaintiff lacks standing to bring these claims because Plaintiff does not have a qualified disability

17   under the ADA and RA. They contend that Plaintiff has three documented medical conditions:

18   (1) type 2 diabetes; (2) hypertension; and (3) a congenital heart condition. They argue that none

19   of these conditions substantially limit one or more of Plaintiff's major life activities so as to

20   qualify as a disability under the ADA.

21          Next, they argue that to the extent Plaintiff alleges employment discrimination under

22   Title I of the ADA, he did not exhaust his administrative remedies with the Equal Employment

23   Opportunity Commission (EEOC) prior to commencing this lawsuit. (*Id.* at 13-14.) Insofar as

24   Plaintiff is proceeding under Title II of the ADA, Defendants argue that he was not denied

25   advancement to level one status solely because of his disability as he was denied level one status

26   for several reasons, including that he did not take advantage of programming, educational or

27   work opportunities. (*Id.* at 15.) They go on to argue that Plaintiff's inability to work is his own

28

1    decision, so it cannot be said that the prison did not give him a job and preclude his advancement

2    to level one status because of his disability. (*Id.*)

3    **D. Defendants' Motion for Summary Judgment-Counts III and IV**

4        In their motion for summary judgment as to Counts III and IV, Defendants argue that

5    Plaintiff has failed to show any actual injury relative to the alleged actions regarding his

6    grievances. With respect to his grievance addressing the institutional level system, grievance

7    2006-29-58159, Defendants assert that Plaintiff was able to timely file this action as to that claim

8    so he did not suffer any actual injury as a result of any delays in responding to his grievance.

9    (Doc. # 117 at 5-7.) As for his grievance that addressed an alleged abuse of the grievance

10   process, Defendants assert that Plaintiff simply stopped trying after his grievance was rejected as

11   improper at the informal level for containing multiple issues. (*Id*. at 6-7.) They further contend

12   that McDaniel did not personally participate in the conduct giving rise to these claims. (*Id*. at 7.)

13   Finally, they argue that Plaintiff failed to exhaust his administrative remedies regarding the

14   claims asserted in Counts III and IV, as he never took grievance 2006-29-67049 past the

15   informal level. (*Id*. at 9.)

16       **II. SUMMARY JUDGMENT STANDARD**

17       "The purpose of summary judgment is to avoid unnecessary trials when there is no

18   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

19   F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

20   judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

21   525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

22   (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

23   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

24   Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

25   issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

26   250 (1986).

27       A party asserting that a fact cannot be or is genuinely disputed must support the
     assertion by:

28   (A) citing to particular parts of materials in the record, including depositions,
     documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of

1   material fact, the opposing party need not establish a genuine dispute of material fact

2   conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a

3   jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.,*

4   *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and

5   citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find

6   for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v.*

7   *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot

8   avoid summary judgment by relying solely on conclusory allegations that are unsupported by

9   factual data. *Id*. Instead, the opposition must go  beyond the assertions and allegations of the

10  pleadings and set forth specific facts by producing competent evidence that shows a genuine

11  dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

12        That being said,

13  [i]f a party fails to properly support an assertion of fact or fails to properly address
    another party's assertion of fact as required by Rule 56(c), the court may: (1) give

14  an opportunity to properly support or address the fact; (2) consider the fact
    undisputed for purposes of the motion; (3) grant summary judgment if the motion

15  and supporting materials—including the facts considered undisputed—show that
    the movant is entitled to it; or (4) issue any other appropriate order.

16  

17  Fed. R. Civ. P. 56(e).

18        At summary judgment, the court's function is not to weigh the evidence and determine

19  the truth but to determine whether there is a genuine dispute of material fact for trial. *See*

20  *Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all

21  justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is

22  merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

23  50 (citations omitted).

### III. DISCUSSION

**A. ADA & RA Claims**

24        Plaintiff moves for summary judgment as to his ADA and RA claims in Count I. (Doc.

25  

26  # 39.) Defendants' oppose this motion (Doc. # 73) and have filed a cross-motion to dismiss these

27  claims (Doc. # 74).

28  ///

1

**1. Plaintiff's Reference to the Fourteenth Amendment**

2       Preliminarily, to the extent Plaintiff references claims under the Fourteenth Amendment

3  in connection with his claims in Count I (*see, e.g.,* Doc. # 39 at 38), the screening order limited

4  Count I only to claims under the ADA and RA. (Doc. # 19 at 4.)

5

**2. OP 516 Is Not Invalid Because it is Not Dated**

6       Plaintiff's assertion that OP 516 is invalid because it is not dated (Doc. # 39 at 37-38) is

7  without merit. The version of OP 516 Plaintiff provided has an effective date of March 4, 2013,

8  clearly stated at the top of the document. (Doc. # 39-2 at 16.) The signatures of authority from

9  NDOC appear at the bottom of the document. (Doc. # 39-2 at 19.) There is no authority to

10  support Plaintiff's contention that an OP is invalid because the signatures do not have a date next

11  to them, or because the effective date is not on the same line as the signatures.

12

**3. Defendants' Cross-Motion to Dismiss Must be Treated as a Motion for Summary**

13  **Judgment**

14       Defendants' cross-motion to dismiss relies on evidence beyond the complaint. Generally,

15  the court may not consider any material beyond the pleadings in ruling on a motion for dismiss

16  without converting it to a motion for summary judgment. *See Swartz v. KPMG LLP*, 476 F.3d

17  756, 763 (9th Cir. 2007) (the court will "consider only allegations contained in the pleadings,

18  exhibits attached to the complaint, and matters properly subject to judicial notice"). While

19  Defendants reference that the court may consider facts of which it may take judicial notice in

20  ruling on a motion to dismiss, their motion does not request the court take judicial notice of any

21  facts; nor, does the motion present any facts of which the court could sua sponte take judicial

22  notice. For this reason, the motion must be treated as one for summary judgment. Plaintiff was

23  given sufficient notice that the court may treat the motion as such in the *Klingele* order issued

24  following the filing of Defendants' motion. (*See* Doc. # 77.)

25

**4. Defendant's Standing Argument**

26       The court will now address Defendants' argument that Plaintiff lacks "standing" because

27  he is not a qualified individual with a disability under the ADA and does not want to work.

28  (Docs. # 74/75 at 11-16.)

1     "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

2  "Controversies.'" *Susan B. Anthony List v. Driehaus,* 134 S.Ct. 2334, 2341 (2014). Standing is a

3  core component of the Article III case or controversy requirement and focuses on whether the

4  action was initiated by the proper plaintiff. *See, e.g., Davis v. Fed. Election Comm'n,* 554 U.S.

5  724, 732-33 (2008). "To establish Article III standing, a plaintiff must show (a) an 'injury in

6  fact', (2) a sufficient 'causal connection between the injury and the conduct complained of,' and

7  (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Driehaus*, 134 S.Ct.

8  at 2341 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Only when these

9  elements are absent does the court lack jurisdiction.

> When the suit is one challenging the legality of government action or inaction, the
> nature and extent of facts that must be averred (at the summary judgment stage) or
> proved (at the trial stage) in order to establish standing depends considerably upon
> whether the plaintiff is himself an objection or the action (or forgone action) at
> issue. If he is, there is ordinarily little question that the action or inaction has
> caused him injury, and that a judgment preventing or requiring the action will
> redress it.

*Id*. at 561-62.

The purpose of the injury requirement is to verify that the plaintiff has suffered an

invasion of his "legally protected interests"−that is, an injury sufficiently definite and particular

such that the law recognizes that a bona fide personal harm has occurred. *Id*. at 561. The injury

showing eliminates frivolous lawsuits that complain only of generalized grievances common to

all members of the public. *Id.* at 575. In other words, the injury requirement examines the quality

and nature of the alleged harm, rather than whether the harm actually occurred. When a harm

alleged by the plaintiff plainly falls within the broad categories of harms to those interests that

federal courts recognize as legally protected, assertions that the plaintiff has not suffered the

injury alleged speak more readily to the substantive elements of particular claims and doctrines,

rather than to the constitutional powers of the federal courts. Here, Plaintiff's alleged injuries are

cognizable under the ADA and RA, and thus satisfy the injury requirement.

### 5. Title I of the ADA

Defendants also argue that to the extent Plaintiff's complaint can be construed as

asserting an employment discrimination claim under Title I of the ADA, Plaintiff failed to

exhaust his administrative remedies with the EEOC. Neither Plaintiff nor the court in screening Plaintiff's complaint have construed Plaintiff's averments as including a claim under Title I of the ADA. Instead, as Plaintiff acknowledges, his ADA claim is limited to Title II of the ADA. Therefore, the court need not address Defendants' argument that Plaintiff failed to exhaust his administrative remedies with the EEOC.

### 6. Exhaustion

To the extent Plaintiff argues that he has exhausted his administrative remedies relative to grievance 2006-29-58159 (Doc. # 39 at 48-50), Defendants do not dispute this is the case.

### 7. Plaintiff's Claim that He Cannot Be Forced to Work

Throughout his briefing, in support of his ADA and RA claims Plaintiff argues that he cannot be forced to work within the prison. While the Thirteenth Amendment prohibits involuntary servitude, it contains an explicit exception for those duly convicted of a crime. U.S. Const. amend XIII, § 1 ("Neither slavery nor involuntary servitude, *except as a punishment for crime whereof the party shall have been duly convicted*, shall exist within the United States, or any place subject to their jurisdiction." (emphasis added). Plaintiff admits he has been duly convicted of a crime; therefore, this argument that he cannot be forced to work in order to advance through the level system is without merit. The court will now address the background and substance of the ADA and RA claims.

### 8. Background Facts

On March 4, 2013, Defendants implemented the institutional level system at NNCC pursuant to OP 516. (Doc. # 39 at 37; Docs. # 74/75 at 3, Baca Decl., Doc. # 74-2 at 2 ¶ 4.) According to Baca, this was "designed to act as both an incentive to foster good behavior and as a means to control the movements of [general population] inmates at NNCC." (Baca Decl., Doc. # 74-2 at 2 ¶ 4.) Baca asserts that in implementing OP 516, he was complying with the edicts of AR 516 which requires such implementation. (*Id*. ¶ 5; .Doc. # 74-3.) One of the performance based criteria an institution can take into account in AR 516 is an inmate's work performance. (Baca Decl., Doc. # 74-2 at 2  ¶ 6; Doc. # 74-3 at 2.) Other performance based criteria include disciplinary activity, program compliance, appearance and environment. (Doc. # 74-3 at 2-3.)

1   The following privileges are allowed to be used as incentives: property, appliances, program

2   access, work, yard/tier time, phone access, canteen, recreation/gym access, clothing, packages,

3   and work assignments. (*Id.* at 3-4.) Level one allows the maximum number of privileges. (*Id.* at

4   4.)

5       According to its terms, OP 516 specifically requires that in order to advance to level one

6   status, the inmate, *inter alia*, "must have a job." (OP 516.02.1, Pl.'s Ex. 18, Doc. # 39-2 at 17.)[3]

7   According to OP 516, the only benefits that level one inmates get that level two inmates do not

8   are outside workout equipment and access to hobby craft. (Compare OP 516.02.2 to OP

9   516.03.2, Pl.'s Ex. 18, Doc. # 39-2 at 17-18.) The more detailed guidelines, however, indicate

10  that level two inmates do in fact have access to the hobby craft program. (*See* OP 516.1.15, Pl.'s

11  Ex. 18, Doc. # 39-2 at 22; OP 516.2.15, Pl.'s Ex. 18, Doc. # 39-2 at 27.) Therefore, the only

12  difference between level one and level two appears to be access to outside workout equipment.[4]

13      Plaintiff claims he is a person with a qualified disability for purposes of the ADA and

14  RA, that NDOC regards Plaintiff as a person with a disability, and that his medical classification

15  demonstrates he has a disability. (Doc. # 39 at 38-39.) He asserts that his medical classification

16  renders him ineligible for any prison work assignment within NDOC; therefore, he is precluded

17  from advancing to NNCC's level one status (because he has to have a work assignment) and

18  participating in its programs and receiving its benefits, including outdoor exercise equipment and

19  a music program. (*Id.* at 39.)

20      Defendants, on the other hand, argue that Plaintiff does not have a qualified disability

21  under the ADA, and even if he did, his failure to advance to level one status was not solely

22  because of such disability.

23  ///

24  ///

25  _____

26  [3] Level two, on the other hand, states that inmates are expected to "secure in unit work assignments, enroll[
27  ] in education and/or programming." (OP 516.03.1, Pl.'s Ex. 18, Doc. # 39-2 at 18.)

28  [4] The court is only assessing the difference between levels one and two because it is clear that when
Plaintiff was moved to level three it was due to his failure to work *or* enroll in programming or education, and his
failure to program or enroll in education courses cannot be said to have been because of his "disability."

- 12 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**9. Analysis**

      **a. Law of the ADA & RA**

     Title II of the ADA and § 504 of the RA "both prohibit discrimination on the basis of disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). The ADA applies only to public entities, while the RA applies to all federally funded programs. *Id*.

     Title II of the ADA provides:
> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

     The RA provides in relevant part: "No otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a).

     Both the ADA and RA apply to inmates in prisons. *See Penn. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 208-210 (1998) (acknowledging that "[m]odern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')"); *United States v. Georgia*, 546 U.S. 151, 154 (2006); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010) (noting decisions affirming that ADA and RA apply to state prisoners); *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007) (applying ADA and RA to prisoner's claims); *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997); *Duffy v. Riveland,* 98 F.3d 447 (9th Cir. 1996).

     The two acts are nearly identical and case law construing Title II of the ADA generally applies equally to claims under the RA. *See, e.g., Duvall v. County of Kitsap*, 260 F.3d 1124, 1135-36 (9th Cir. 2001).

     "In ADA cases, the plaintiff bears the burden of establishing the elements of the prima facie case[.]"*Pierce v. County of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008). A plaintiff pursuing a claim under the ADA and RA must show:

> (1) he "is an individual with a disability;" (2) he "is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;" (3) he "was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and (4) "such exclusion, denial of benefits, or discrimination was by reason of [his] disability."

*McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (quoting *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (per curiam)).

A claim under the RA similarly requires that a Plaintiff establish: "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefits; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *O'Guinn*, 502 F.3d at 1060 (internal quotation marks and citation omitted).

The ADA and RA encompass all services, programs, and activities provided by a prison to its prisoners. *See, e.g., Armstrong v. Wilson*, 124 F.3d 1019, 1024 (9th Cir. 1997).

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

An individual has a "disability" within the meaning of Title II of the ADA if he has: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) [is] regarded as having such an impairment[.]" 42 U.S.C. § 12102(1).

Thus, there are three prongs of the disability definition, or three ways an individual may prove he is disabled under the ADA (and RA). Under the first prong of the disability test, the individual must have a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1)(A). Under the ADA's implementing regulations, "physical or mental impairment" means:

> (A) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal; special sense organs; respiratory, including speech

organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine;
(B) Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

28 C.F.R. § 35.104.

"[P]hysical or mental impairment includes, but is not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism." 28 C.F.R. § 35.104.

"Major life activities" means functions such as "caring for one's self, performing manual tasks, seeing, hearing, eating, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 35.104. They also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). "It is not possible to include a list of all the specific conditions, contagious and noncontagious diseases, or infections that would constitute physical or mental impairments because of the difficult of ensuring the comprehensiveness of such a list, particularly in light of the fact that other conditions or disorders may be identified in the future." 28 C.F.R. Pt. 35, App. B § 35.104.

When the major life activity under the first test for disability is working (as Plaintiff alleges is the major life activity impacted here), to be substantially limited, the individual must be unable to work in a broad class of jobs. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), *overturned on other grounds due to legislative action in* U.S. Pub. L. 110-325 (Jan. 1, 2009); *see also* 29 C.F.R. § 1630.2(j)(3)(1).

The second prong of the disability definition—having a record of such an impairment—means that the individual "has a history of, or has been misclassified as having, a

- 15 -

mental or physical impairment that substantially limits one or more major life activities." 28

C.F.R. § 35.104. "This provision [was] included in the definition in part to protect individuals

who have recovered from a physical or mental impairment that previously substantially limited

them in a major life activity." 28 C.F.R. Pt. 35, App. B § 35.104.

The third prong of the disability definition−being regarded as having an

impairment−requires that the individual establish "that he or she has been subjected to an action

prohibited under [Title II of the ADA] because of an actual or perceived physical or mental

impairment whether or not the impairment limits or is perceived to limit a major life activity." 42

U.S.C. § 12102(3)(A). It means that the individual:

> (i) Has a physical or mental impairment that does not substantially limit major life
> activities but that is treated by a public entity as constituting such a limitation;
> (ii) Has a physical or mental impairment that substantially limits major life
> activities only as a result of the attitudes of others toward such impairment; or
> (iii) Has none of the impairments defined in paragraph (1) of this definition but is
> treated by a public entity as having such an impairment.

28 C.F.R. § 35.104. "This test ... is intended to cover persons who are treated by a public entity

as having a physical or mental impairment that substantially limits a major life activity. It applies

when a person is treated as if he or she has an impairment that substantially limits a major life

activity, regardless of whether that person has an impairment." 28 C.F.R. Pt. 35, App. B §

35.104. "A person who perceives himself or herself to have an impairment, but does not have an

impairment, and is not treated as if he or she has an impairment, is not protected under this test."

28 C.F.R. Pt. 35, App. B § 35.104. Under this prong, it is the defendant's perception that is key.

*Id.*

**b. Discussion**

For the reasons discussed below, the court finds that a genuine dispute of material fact

exists as to whether Plaintiff is disabled under the ADA and RA[5]; therefore, both Plaintiff's

motion for summary judgment as to his ADA and RA claims and  Defendants' cross-motion to

dismiss Plaintiff's ADA and RA claims should be denied.

---

[5] Defendants concede that a genuine dispute of material fact exists as to whether Plaintiff is disabled under the ADA and RA. (*See* Docs. # 73/74 at 7:11-12, 8:17.)

In his briefing, Plaintiff states that he is an individual with a disability pursuant to Title II of the ADA. (*See* Doc. # 39 at 20 ¶¶ 8-12, 37, 39, and referencing his Exhibits 12, 19, 20; Pl.'s Aff., Ex. 20, Doc. # 39-2 at 39 ¶ 2, 41 ¶ 5.) He claims that his medical records and medical classification have rendered him ineligible for a prison work assignment and that he has inquired into work assignments that would make him eligible for level one status on various occasions and each time was told he was ineligible for work because of his medical restrictions. (*Id.*) The ability to work is a major life activity and he is otherwise eligible for level one status. As such, he contends that he has been denied the benefits of level one status as a result of disability.

While Plaintiff focuses mainly on the third prong of the disability definition−that he has been regarded as disabled by NDOC by virtue of his medical classification and resulting inability to obtain a work assignment−he, in essence, argues that he qualifies as disabled under all three prongs of the ADA definition.

The first prong defines disability as a physical or mental impairment that substantially limits a major life activity. Plaintiff does not identify a specific physical impairment, but contends that his medical status, as set forth in his medical records and classification, have substantially limited a major life activity as he has been precluded from obtaining any job assignment at NNCC, which is a prerequisite for advancement to level one status.

The second prong considers an individual disabled when that individual has a record of an impairment that substantially limits a major life activity, and Plaintiff contends that his medical records contain his medical classification and restrictions which have precluded him from working.

Finally, under the third prong of the disability definition, which covers an individual regarded as having an impairment that substantially limits a major life activity, Plaintiff similarly argues that due to his medical classification (which precludes him from working), NDOC has regarded him as having such an impairment.

In support of his position, Plaintiff states in his affidavit that he inquired many times about obtaining a work assignment, but was told he could not obtain a work assignment due to his medical status. (Pl.'s Aff., Doc. # 39 at 41.) Plaintiff also relies on a response to a request he

1    sent his caseworker in February 2014, where he asked to be submitted for a job assignment

2    which would make him eligible for level one status. (Pl.'s Ex. 19, Doc. # 39-2 at 36.) On March

3    4, 2014, he was advised by the caseworker: "Due to your med restrictions I cannot give you a job

4    at this time." (*Id.*)[6]

5          Defendants argue that Plaintiff has not sufficiently identified a physical impairment for

6    purposes of establishing he is disabled under the ADA and RA. Defendants further contend that

7    Plaintiff suffers from only three documented medical conditions, Type 2 diabetes, hypertension

8    and a congenital heart condition secondary to the placement of a surgically placed stent in his

9    artery. (Docs. # 73/74 at 3.) They argue that his symptoms from these conditions do not

10   substantially limit any major life activity. (*Id.* at 4, 12-13.)

11         Defendants' argument regarding Plaintiff's symptoms from three documented medical

12   conditions misses the point. Plaintiff's theory is not that any particular symptom from his

13   diabetes, hypertension or congenital heart condition substantially limits him, but that his

14   combined medical conditions have resulted in a medical classification which has precluded him

15   from obtaining a work assignment within NNCC.  The ability to work is indisputably a major life

16   activity.

17         The court finds that Plaintiff's statements in his affidavit that his medical records and

18   classification preclude him from working within NNCC and that he in fact requested work

19   assignments to advance to level one status but was told he could not obtain a work assignment

20   due to his medical restrictions, coupled with the caseworker's response in March of 2014 that

21   corroborates Plaintiff's statements, are sufficient to meet his burden of presenting evidence that

22   he is disabled under the ADA and RA.[7] Plaintiff appears to be asserting that a combination of

23

24        [6] Plaintiff references an Exhibit 12 in support of his claim, only the cover page of the exhibit was submitted
     and not the actual exhibit. (*See* Doc. # 39-1 at 47, Doc. # 39-2 at 1.) He identifies this as his medical classification.
25   Nevertheless, Defendants seem to acknowledge his restricted status as defendant Baca states that in order for him to
     assist Plaintiff in obtaining a job to qualify for level one status, he would have to get physician approval.

26        [7] While Plaintiff should could have more specifically identified the physical impairments that have
27   substantially impaired a major life activity, as is explained in detail *infra*, he presents sufficient evidence under both
     the second and third prongs of the ADA definition of disability to proceed with his claim. Moreover, he appears to
     be claiming that not just one impairment resulted in his disability, but a combination of all of his documented
28   physical impairments led to the medical restrictions which precluded him from working. The court finds this
     sufficient to proceed even under prong one of the disability definition.

physical impairments identified in his medical records, and not just one particular documented impairment, has substantially limited a major life activity–his ability to work.

In addition to meeting his burden relative to his own motion for partial summary judgment, this evidence serves to raise a genuine dispute of material fact as to whether he is disabled so as to defeat Defendants' cross-motion on this issue. Plaintiff is not required to produce specific medical evidence in support of his claim, as Defendants suggest. "Ninth Circuit precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity at the summary judgment stage. Rather, our precedent supports the principle that a plaintiff's testimony may suffice to establish a genuine issue of material fact." *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005) (citing *McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999)).

Just as Plaintiff's evidence raises a genuine dispute of material fact as to whether or not he is disabled under the ADA and RA, Defendants have likewise presented evidence to raise a genuine dispute of material fact on this issue in response to Plaintiff's motion, under any of the three prongs of the disability definition. Defendants point to the grievance responses Plaintiff received when he grieved his inability to advance to level one status.

> First, in response to his informal level grievance on this issue, Plaintiff was advised: According to OP 516.2 you are a Medium Custody Inmate that meets the requirements for Level II. Pending available bed space you are eligible to be transferred to a Unit with Level II privileges. With your current Medical Classification you are encouraged to obtain a job that does not exceed your restrictions and continue to advance through the Level System. Grievance Denied.

(Pl.'s Ex. 5, Doc. # 39-1 at 28.)

In his "response" (his first level grievance), Plaintiff asserted that due to his medical restrictions, he falls under a "medically unassigned" status which precludes him from holding any work assignment, indicating that doctors ordered that he not work. (Pl.'s Ex. 16, Doc. # 39-2 at 11.) Therefore, he stated that he could never be eligible for level one status. (*Id.*) In response, Plaintiff was told, *inter alia*, "you have had every opportunity to work and program in order to advance through the level system. A review of your current work assignment shows unassigned

1    as you have not applied to work or enrolled in any programs therefore not making you eligible

2    for level 1." (Pl.'s Ex. 17, Doc. # 39-2 at 14.)

3           Prison officials responded to Plaintiff's second level grievance on this issue on March 10,

4    2014, stating, *inter alia*:

5           Per NRS 209.352 the Director may establish, with the approval of the Board, a
            system for offender management, to be implemented in each institution and
6           facility of the Department, which consists of structured living programs for
            offenders and the management of units by the staff, with levels of custody,
7           security and privileges and opportunities for offenders based upon the assessed
            needs of the offenders as determined by their initial and ongoing classification
8           and evaluation. AR 516 authorizes 3 levels for a medium custody institution and
            indicates each level should have performance based criteria, including but not
9           limited to work, disciplinary, program compliance, appearance, and environment.
10          When you claim the level system was implemented at NNCC on 3-4-13, you were
            in Unit 2, which was designated as a Level II unit. You are in a Level II unit as of
11          this date as well. Previous response indicates that you have failed to work or
            program as required to meet criteria for Level I. You have several medical
12          restrictions, including a restriction which indicates that work/program
            assignments are limited due to functional limitation, not that you are "medical
13          unassigned" because you can[8] perform any work or attend any programs. You
            could, should you choose, work with medical and classification staff to try to get
14          into a work or program assignment consistent with this medical restriction. Many
            such NDOC inmates have this restriction and are able to work and/or program and
15          be housed in Level 1.
16

17   (Pl.'s Ex. 37, Doc. # 39-3 at 96.)

18          Insofar as Plaintiff asserts a disability under the first prong of the disability definition,

19   this evidence creates a genuine dispute of material fact as to whether Plaintiff suffered from a

20   physical impairment(s) which substantially limited a major life activity. Specifically, this

21   evidence raises a question as to whether there were jobs that Plaintiff could perform consistent

22   with his functional limitations that would allow him to qualify for level one status. Plaintiff, on

23   the other hand, maintains that whenever he inquired about such assignments he was told he was

24   precluded due to his medical restrictions and provides his caseworker's response in March 2014

25   in corroboration of this statement.

26          Under the second prong of the disability definition, this evidence raises a genuine dispute

27   of material fact as to whether Plaintiff had a record of an impairment that substantially limits a

28   
─────────────────────
        [8] The court assumes the author meant to say "cannot" here.

- 20 -

major life activity. The grievance response at the second level suggests that while Plaintiff may

have functional limitations, he was not precluded from performing *any* work assignment. Again,

Plaintiff presents evidence to the contrary.

Under the third prong of the disability definition, this evidence raises a genuine dispute of

material fact as to whether Plaintiff was regarded as having such an impairment. Plaintiff argues

that it does not matter whether Plaintiff had the ability to work or not because NDOC regarded

him as having a disabling impairment; however, under this prong, Defendants' perceptions are

key, and this evidence raises a genuine dispute of material fact as to the status of those

perceptions. The evidence indicates that perhaps Defendants did not in fact consider Plaintiff

unable to work. Plaintiff, on the other hand, presents evidence that they did. This will need to be

resolved by the fact finder.

Defendants argue that they should be granted summary judgment on the additional basis

that Plaintiff cannot establish that he was denied the benefits of level one status due solely to his

disability, because his failure to advance to level one was a result of other factors, including his

failure to participate in programming or education courses. (Docs. # 73/74 at 5, 15; Baca Suppl.

Dec., Doc. # 89-6.) Defendants are correct that Plaintiff must otherwise be eligible for level one

status; however, participation in programming or education courses is not a requirement for level

one status. The only requirements for advancement to level one status are: the inmate must have

spent a minimum of thirty days in level two; the inmate must be 180 days disciplinary free; the

inmate *must have a job*; and the inmate must be in compliance with all housing rules and

operations procedures in order to remain in level one housing. (OP 516.02.1, Pl.'s Ex. 18, Doc.

# 39-2 at 17.)

Defendants also argue that Plaintiff cannot show that he is otherwise eligible for level one

status because he testified in his deposition that even if a job was available he may not take it

because he does not think jobs exist that he is interested in. (Docs. # 73/74 at 15; Pl.'s Depo. at

Doc. # 73-4.) Therefore, they contend that the reason Plaintiff does not advance to level one

status is not because he is disabled and precluded from working, but because he is "picky with

jobs." (Docs. # 73/74 at 15.) This argument is unavailing. There is no evidence before the court

- 21 -

1   that Plaintiff has in fact been offered any work assignment, let alone evidence that he rejected

2   such an assignment. If that were the case, the court could surely find that Plaintiff's exclusion

3   from the benefits of level one status was not due solely to his disability, but instead due to his

4   own choices; however, those are not the facts before the court.

5        Defendants also assert that Baca agreed to offer Plaintiff a level one qualifying job after

6   Plaintiff met with Dr. Gedney to ascertain his level of disability and his physical limitations, and

7   would prescribe any reasonable accommodations, but Plaintiff refused to accept the appointment.

8   (Docs. # 73/74 at 5 n. 5; Baca Decl., Doc. # 74-2.) Plaintiff disputes this. (Pl.'s Supp. Aff., Doc.

9   # 83 at 30 ¶ 5.) Plaintiff contends he did not have any communications with Baca since March 4,

10  2013. (*Id*.) In their reply, Defendants clarify that the actual communication came from counsel

11  for Baca as he was a defendant in this litigation at that time. (Doc. # 89 at 2-3.)

12       Plaintiff further contends that there is no need for an additional assessment with

13  Dr. Gedney because during a March 15, 2013 appointment with Dr. Gedney, Plaintiff was

14  advised that she would not permit Plaintiff to hold a work assignment. (Pl.'s Supp. Aff., Doc.

15  # 83 at 30 ¶¶ 4-5.) He mentions that he did not refuse a doctor's appointment as none was ever

16  made. (*Id*. at 30-31 ¶ 5.) He acknowledges that he did sign a medical refusal form, but contends

17  he signed it under duress and he did not state on the form what he was refusing, which he claims

18  was only the blood draw in October 2014. (*Id*.)

19       There are factual disputes regarding Baca's asserted overture; therefore, this cannot serve

20  as a basis for granting summary judgment in Defendants' favor.

21       Finally, Defendants briefly mention that in order to recover monetary damages under

22  Title II of the ADA, a plaintiff must prove intentional discrimination on the part of the defendant.

23  (Docs. # 73/74 at 15:6-14.) Defendants then move on to another argument, without stating how

24  Plaintiff has failed to prove intentional discrimination. Plaintiff addresses the argument in his

25  opposition (Doc. # 85); therefore, the court will address it.

26       Plaintiff's complaint contains a request for relief that only seeks monetary damages.

27  (Doc. # 20 at 32.) Defendants are correct that in order to "recover monetary damages under

28  Title II of the ADA or the [RA], a plaintiff must prove intentional discrimination on the part of

the defendant." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (citing *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998)). To prove intentional discrimination, a plaintiff must prove deliberate indifference. *See id*. at 1138-39.  "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id*. at 1139 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1988); *id.* at 395 (O'Connor, J., concurring) (deliberate indifference requires both "some form of notice ... and the opportunity to conform to [statutory] dictates")). "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall*, 260 F.3d at 1130.

In response, Plaintiff asserts that he was advised by defense counsel that Defendants were aware of deficiencies with OP 516 and the need to make it "ADA friendly," yet no changes have been made. (Doc. # 85 at 13.) Moreover, Plaintiff made Defendants aware of the deficiencies through his grievances which alerted Defendants that he was being excluded from the benefits of level one status based on his disability, and Defendants did not remedy the situation. While Defendants argue that Baca has since offered to work with Plaintiff to determine if there is a job he can perform despite any functional impairments, this does not change the fact that nothing was done between the time that Plaintiff grieved the issue until the asserted offer to assist him was made, for which he may be entitled to damages. This is at least sufficient to create a genuine dispute of material fact as to whether Defendants were deliberately indifferent so that Plaintiff may proceed with his claim for damages under the ADA and RA.

For these reasons, Plaintiff's motion for partial summary judgment on his ADA and RA claims and Defendants' cross-motion to dismiss Plaintiff's ADA and RA claims should be denied.

**B. Count III-Access to Courts**

On screening, the court concluded that Count III stated a colorable claim for denial of the right of access to the courts. (Doc. # 19 at 6-7.) This claim is based on the allegation that

1   Defendants intentionally delayed the grievance process which frustrated Plaintiff's ability to

2   exhaust his administrative remedies and file this lawsuit. (*Id.* at 7.) The court did not permit

3   Plaintiff to proceed with a due process claim. Accordingly, the court will only address this claim

4   insofar as it relates to Plaintiff's alleged denial of access to the courts.

5          The parties agree that grievance 2006-29-58159 is the only grievance applicable to Count

6   III. Plaintiff's motion is centered on his argument that he exhausted his administrative remedies

7   relative to Count III. Plaintiff's motion does not focus on the elements necessary to establish a

8   claim that his right to access the courts was denied. (Doc. # 39.) Defendants initially argued that

9   Plaintiff failed to exhaust his administrative remedies as to this claim, but subsequently retracted

10  that argument, and argue only that Plaintiff cannot establish the actual injury element of his

11  access to courts claim. (Doc. # 127 at 8 n. 4.)[9]

12         Preliminarily, the court will address Plaintiff's arguments that Defendants' motion fails to

13  contain a statement of material facts not genuinely in issue, and that Defendants were not

14  permitted to file a successive motion for summary judgment. (Doc. # 126 at 12-18, 20-24.)

15  While Defendants do not title their statement of undisputed facts as such, it is contained within

16  their motion. (*See* Doc. # 117 at 2-4.) In addition, the court has already addressed and rejected

17  Plaintiff's argument that Defendants are precluded from bringing a successive motion for

18  summary judgment and will not address the argument again in this instance. (Doc. # 122.)

19         Inmates have a constitutional right of access to the courts. *See Lewis v. Casey*, 518 U.S.

20  343, 346 (1996). To establish a violation of the right of access to the courts, an inmate must

21  establish that he or she suffered an actual injury, a jurisdictional requirement that flows from the

22  standing doctrine and may not be waived. *Id*. at 348 (citation omitted); *see also Alvarez v. Hill*,

23  518 F.3d 1152, 1155 n. 1 (9th Cir. 2008) (explaining, "[f]ailure to show that a 'non-frivolous

24  legal claim ha[s] been frustrated' is fatal" to a claim of denial of access to the courts). "Actual

25  injury" is defined as "actual prejudice with respect to contemplated or existing litigation, such as

26  inability to meet a filing deadline or present a claim." *Id*. at 348 (internal quotation marks and

27

28         [9] Plaintiff requested sanctions as a result of Defendants' inclusion of an argument that he did not exhaust his administrative remedies relative to this claim. In light of counsel's explanation that the exhaustion argument was a result of inadvertence, the court did not entertain Plaintiff's request.

1   citation omitted). The right of access to the courts is limited to non-frivolous direct criminal

2   appeals, habeas corpus proceedings and section 1983 actions. *See Lewis*, 518 U.S. at 343 n. 3,

3   354-55; *Simmons v. Sacramento Cnty. Super. Ct.*, 318 F.3d 1156, 1159-60 (9th Cir. 2003). The

4   right of meaningful access to the courts also extends to established grievance procedures.

5   *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) (citing *Valandingham v. Bojorquez*, 866

6   F.2d 1135, 1138 (9th Cir. 1989); *Hines v. Gomez*, 853 F.Supp. 329, 331-32 (N.D. Cal. 1994)),

7   *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n. 2 (2001). Under the PLRA,

8   an inmate is required to exhaust established administrative remedies (through the grievance

9   process within NDOC) before securing relief in federal court. As such, "a prisoner's fundamental

10  right of access to the courts hinges on his ability to access the grievance system." *Id.*

11          While Plaintiff alleges there was a delay in completing the grievance process as a result

12  of prison officials failure to heed their own response deadlines, it is undisputed that he was

13  ultimately able to exhaust his administrative remedies and file this lawsuit to proceed with his

14  claim that his rights under the ADA and RA were being violated in connection with the prison's

15  level system, and that he was being precluded from accessing the courts. In addition, while he

16  alleges that prison officials failed to follow their own regulations in terms of timely responding

17  to his grievances, it is undisputed that AR 740 allows an inmate to proceed to the next grievance

18  level when a prison response is overdue. Therefore, it cannot be said that Plaintiff suffered actual

19  injury in connection with Count III.

20          Therefore, Defendants should be granted summary judgment as to Count III.

21  **C. Count IV-Access to Courts**

22          In Count IV, Plaintiff alleges that on August 20, 2013, prior to submitting his informal

23  level grievance (number 2006-29-67049), he attempted to informally resolve his claims with his

24  caseworker, defendant Humphrey, to attach to his informal level grievance. (*Id.* at 24.) He claims

25  that he gave Humphrey an inmate request form where he asked Humphrey to acknowledge his

26  attempts to informally resolve his claims, but Humphrey refused to provide this

27  acknowledgement. (*Id.* at 24-25.) He avers that Humphrey admitted Plaintiff could not have his

28  grievance accepted without proof of trying to informally resolve the issues, and that Plaintiff had

1   to exhaust his administrative remedies prior to filing suit. (*Id.* at 25.) The parties also agree that

2   grievance 2006-29-67049 is the only grievance applicable to Count IV.

3        Plaintiff argues that Lisa Walsh improperly responded to his informal level grievance

4   when she was the subject of the grievance, contrary to AR 740.05(1)(D), which made the

5   grievance process functionally unavailable to him. (*Id.* at 36, 50-51; Doc. # 39-3 at 2-11.) He

6   contends that she should not have taken any action with respect to that grievance. (Doc. # 39 at

7   52.) Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to

8   Count IV, and that Plaintiff did not suffer actual injury.

9        The court must first address whether Plaintiff exhausted his administrative remedies with

10  respect to Count IV, for which the pertinent grievance is 2006-29-67049, or whether

11  administrative remedies were effectively unavailable to Plaintiff. Plaintiff does not dispute that

12  he did not pursue this grievance past the informal level. Instead, he argues that Lisa Walsh

13  improperly responded to the grievance when she was a subject of the grievance by rejecting it as

14  improper for containing multiple issues. (Doc. # 126 at 26-27.) In his response, he further

15  contends that the rejection itself was improper because AR 740 does not sanction the rejection of

16  a grievance as improper for containing multiple issues. (*Id.* at 28-29.)

17       The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought

18  with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

19  prisoner confined in any jail, prison, or other correctional facility until such administrative

20  remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his

21  administrative remedies irrespective of the forms of relief sought and offered through

22  administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

23       The failure to exhaust administrative remedies is "'an affirmative defense the defendant

24  must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014), *cert. denied*, 135

25  S.Ct. 403 (Oct. 20, 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007)). Unless the

26  failure to exhaust is clear from the face of the complaint, the defense must be raised in a motion

27  for summary judgment. *See id.* (*overruling in part Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th

28

Cir. 2003) which stated that failure to exhaust should be raised in an "unenumerated Rule 12(b) motion").

As such: "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted). "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim. If discovery is appropriate, the district court may in its discretion limit discovery to evidence concerning exhaustion, leaving until later—if it becomes necessary—discovery related to the merits of the suit." *Id.* at 1170 (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). If there are disputed factual questions, they "should be decided at the very beginning of the litigation." *Id.* at 1171.

"The PLRA mandates that inmates exhaust all available administrative remedies before filing 'any suit challenging prison conditions,' including, but not limited to, suits under § 1983." *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). To be clear, "[a]n inmate is required to exhaust only *available* remedies." *Id.* (emphasis original) (citing *Booth v. Churner*, 532 U.S. 731, 736 (2001)). "To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'" *Id.* (quoting *Brown v. Valoff*, 422 F.3d 926, 937 (9th Cir. 2005)); *see also Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citation omitted).

Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)). The ultimate burden of proof, however, remains with the defendant. *Id.*

The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the

1  agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)."

2  *Id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original).

3       If the court concludes that administrative remedies have not been properly exhausted, the

4  unexhausted claim(s) should be dismissed without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108,

5  1120 (9th Cir. 2003), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir.

6       NDOC's Administrative Regulation (AR) 740 governs the inmate grievance process. (*See*

7  Pl.'s Ex. 1, Doc. # 39-1 at 2-12.) "Inmates may use the Inmate Grievance Procedure to resolve

8  addressable inmate claims including, but not limited to, personal property, property damage,

9  disciplinary appeals, personal injuries, and any other tort claim or civil rights claim relating to

10  conditions of institutional life." (AR 740.03.1, Doc. # 39-1 at 3.) The grievance process at

11  NDOC consists, in essence, of four steps. First, an inmate is "expected to resolve grievable

12  issues through discussion with their caseworker prior to initiating the grievance process [except

13  for allegations of inmate abuse, which are to be immediately reported], or where resolution is not

14  possible such as disciplinary appeals." (AR 740.04.1, Doc. # 39-1 at 5.) "An informal resolution

15  may be accomplished in writing *or* in direct consultation with the appropriate staff." (AR

16  740.04.2, Doc. # 39-1 at 5 (emphasis added).) Next, after attempting to resolve the dispute

17  informally or where informal resolution is not possible, an inmate must file an informal level

18  grievance. (AR 740.05, Doc. # 39-1 at 5-7.)

19       "An inmate who is dissatisfied with the response to a grievance at any level may appeal

20  the grievance to the next level, within the substantive and procedural requirements outlined

21  herein." (AR 740.03.6, Doc. # 39-1 at 4.) Prison officials are to "automatically allow appeals

22  without interference." (AR 740.03.6.A, Doc. # 39-1 at 4.) If a prison response is overdue, an

23  inmate may proceed to the next grievance level (except at the second level as there is no further

24  level for review). (AR 740.03.8.B, Doc. # 39-1 at 4.) In addition, if an inmate does not move

25  forward with his appeal when a response is overdue and instead, elects to wait for a response,

26  "[t]he overdue response does not count against the inmate's timeframe for an appeal." (AR

27  740.03.8.C, Doc. # 39-1 at 4.)

28

If an inmate is unhappy with the response to an informal level grievance, he may proceed with filing a first level grievance. (AR 740.06, Doc. # 39-1 at 7-8.) Finally, if an inmate is not happy with the response to a first level grievance, he may file a second level grievance. (AR 740.07, Doc. # 39-1 at 8.)

AR 740 also provides a discussion of conduct deemed to be an abuse of the grievance procedure. (AR 740.09, Doc. # 39-1 at 9-10.) It is considered to be an abuse of the grievance procedure if a grievance "contains two or more appropriate issues." (AR 740.09.2.F, Doc. # 39-1 at 10.) When an inmate files a grievance that is considered to be an abuse of the grievance procedure, the grievance is to be returned with Form DOC-3098, NDOC's Improper Grievance Memorandum, noting the specific violation. (AR 740.09.3.A, Doc. # 39-1 at 10.) The inmate can resubmit the grievance in proper form, but is not given additional time to do so, unless the timeframe has expired before the inmate receives Form DOC-3098, in which case the inmate has an additional five days from the date the form is received to resubmit the grievance in proper form. (AR 740.09.4, B, Doc. # 39-1 at 10.) In fact, if an inmate fails to resubmit the grievance in proper form within the prescribed time frame, the inmate is considered to have abandoned the grievance. (AR 740.09.4.A, Doc. # 39-1 at 10.)

As indicated above, "a failure to exhaust a remedy that is effectively unavailable does not bar a claim from being heard in federal court." *McBride v. Lopez*, --- F.3d ---, 2015 WL 3953483, at * 2 (9th Cir. Jun. 30, 2015). The Ninth Circuit has considered a handful of cases where it determined the administrative remedies were effectively unavailable, and where exhaustion has been excused. *Id.* In *Nunez v. Duncan*, the court found administrative remedies were unavailable "where a prison warden incorrectly implied that an inmate needed access to a nearly unobtainable prison policy in order to bring a timely administrative appeal[.]" *Albino v. Baca*, 747 F.3d 1162, 1172-73 (9th Cir. 2014), *cert. denied*, 135 S.Ct. 403 (Oct. 20, 2014) (citing *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010)).

In *Sapp v. Kimbrell*, the Ninth Circuit found that "where prison officials declined to reach the merits of a particular grievance 'for reasons inconsistent with or unsupported by applicable regulations,' administrative remedies were effectively unavailable.'" *Id.* (quoting *Sapp v.*

1    *Kimbrell*, 623 F.3d 813 (9th Cir. 2010)). As indicated above, the reason for rejecting Plaintiff's

2    grievance−that it contained multiple issues−was in fact consistent with AR 740.

3            In *Marella v. Terhune*, the Ninth Circuit found administrative remedies were effectively

4    unavailable where the inmate was not given access to the requisite grievance forms within the

5    time frame for filing his grievance. 568 F.3d 1024, 1027-28 (9th Cir. 2009).  Nor was the inmate

6    required to exhaust a remedy he was reliably informed was not available to him. *Id*.

7            In *Albino v. Baca*, the Ninth Circuit held that where a jail did not inform a prisoner of the

8    process for filing a complaint after repeated requests, there was no realistically available remedy.

9    747 F.3d at 1177.

10           Just recently, the Ninth Circuit recognized that an exception to the exhaustion

11   requirement *may* exist where the inmate can demonstrate a threat of retaliation based on both an

12   objective and subjective criteria. *McBride*, 2015 WL 3953483, at * 3 (9th Cir. June 30, 2015).

13           None of these exceptions to the exhaustion requirement applies here.

14           First, contrary to Plaintiff's argument, AR 740 does in fact provide that a grievance may

15   be rejected for containing multiple issues. (AR 740.09.2.F, Doc. # 39-1 at 10.) Plaintiff was

16   advised of this in the rejection, and acknowledges he failed to resubmit an informal level

17   grievance limited to just this issue.[10] He speculates that even if he had resubmitted the grievance,

18   Walsh would have rejected it anyway, but there is no evidence of this and this is not a basis to

19   find the administrative remedies were unavailable to Plaintiff.

20           To the extent Plaintiff speculates that his grievance would have been rejected if

21   resubmitted on the additional basis that he failed to include documented attempts to informally

22   resolve the issue because Humphrey would not acknowledge such attempts, this argument is also

23   foreclosed. Plaintiff is only required to take the steps held out to him by NDOC in completing

24   the grievance process. AR 740 states that attempts at informal resolution "may be accomplished

25   in writing *or* in direct consultation with the appropriate staff." (AR 740.04.2, Doc. # 39-1 at 5

26   (emphasis added).) Plaintiff asserts that he did directly consult Humphrey in an effort to

27

28           [10] Notably, the grievance was *not* rejected because of a failure to notate attempts to resolve the issue
     informally, which is the basis of Plaintiff's claim against Humphrey−that he refused to document Plaintiff's attempts
     to resolve the dispute informally when he knew this was required to complete the grievance process and file suit.

1    informally resolve his issues. That is sufficient under AR 740. He could have gotten written

2    confirmation of these efforts, but was not required to do so under AR 740. Therefore, he could

3    have proceeded in filing an informal grievance (limited to one issue) which simply described his

4    consultation with Humphrey in an effort to informally resolve the matter. He did not do so.

5            Second, Plaintiff asserts that the grievance process was effectively unavailable to him

6    because Walsh, who was a subject of the grievance, rejected the grievance as improper for

7    containing multiple issues. In other words, Plaintiff contends that allowing Walsh respond to the

8    grievance violated AR 740, and therefore made the grievance process unavailable to him.

9            It should be noted that AR 740 provides that "[f]f the person who would normally

10   respond to a grievance is the subject of the grievance, the CCS III/AW should respond to the

11   Informal Grievance." (AR 740.05.2.D, Doc. # 39-1 at 5.) Lisa Walsh was the NNCC associate

12   warden at NNCC. AR 740 does not contain a provision governing the situation where a person

13   who is a subject of a grievance is also the associate warden. Therefore, AR 740 itself does not

14   render the grievance process unavailable to Plaintiff. Moreover, the only reason the informal

15   level grievance was rejected is because the grievance contained multiple issues. Plaintiff did not

16   proceed with filing another informal level grievance limited to this one issue. To the extent

17   Plaintiff's briefing can be read to include an argument that he felt threatened or unable to

18   proceed with the grievance process because Walsh was a responder, the court finds this argument

19   to be without merit.

20          Plaintiff has not explicitly stated that he suffered a threat of retaliation for grieving this

21   issue, but insofar as the court can construe his argument as asserting such a claim, it is without

22   merit pursuant to *McBride*. The Ninth Circuit adopted the following criteria for determining

23   whether exhaustion is excusable in the context of a threat of retaliation: "'(1) the threat [of

24   retaliation] actually did deter the plaintiff inmate from lodging a grievance or pursuing a

25   particular part of the process; and (2) the threat is one that would deter a reasonable inmate of

26   ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance

27   process that the inmate failed to exhaust.'" *McBride,* 2015 WL 3953483 at * 4 (quoting *Hemphill*

28   *v. New York*, 380 F.3d 680, 688 (2d Cir. 2004)).

1    Even if Plaintiff could satisfy the subjective prong, he cannot satisfy the objective prong.

2  Walsh responded to Plaintiff's grievance by rejecting it as improper because it grieved more than

3  one issue. This would not deter an inmate from lodging a proper grievance. In addition, he

4  asserts that Humphrey refused to acknowledge his efforts to informally resolve the dispute, but

5  as was indicated above, Plaintiff only had to state that he engaged Humphrey in an effort to

6  informally resolve the matter; it was not necessary that the efforts be documented in writing.

7  Therefore, Humphrey's conduct would not deter a reasonable inmate from lodging a grievance or

8  pursing the grievance process.

9    When the court concludes that an inmate has failed to exhaust his administrative

10  remedies with respect to a claim proceeding before the court, the claim should be dismissed

11  without prejudice; however, in this case, the court also concludes that Plaintiff cannot establish

12  actual injury relative to this claim. Therefore, Defendants are entitled to summary judgment and

13  not just a dismissal without prejudice as to Count IV.

14    The basis of Plaintiff's claim in Count IV is that he was denied access to the courts as a

15  result of Humphrey's refusal to acknowledge Plaintiff's attempts to informally resolve the issue

16  so that Plaintiff could complete the grievance process in order to exhaust his administrative

17  remedies before filing suit. Nevertheless, Plaintiff still filed an informal level grievance despite

18  Humphrey's failure to acknowledge the attempts at an informal resolution. Notably, the

19  grievance was *not* rejected by Walsh because Plaintiff failed to document efforts to informally

20  resolve the issue, but only rejected the informal level grievance because it contained multiple

21  issues. Plaintiff failed to re-file the informal level grievance limited to one issue. There is no

22  evidence connecting the rejection of the grievance as improper with Humphrey's conduct, and no

23  evidence that Humphrey's conduct was the cause of Plaintiff being unable to bring a claim

24  before the court. As such, Plaintiff cannot demonstrate actual injury and Defendants are entitled

25  to summary judgment on this claim.

26  **D. Count II**

27    Plaintiff briefly references his claim in Count II, that he was reduced from level two

28  status to level three status in retaliation for filing grievances, but then argues that this violated his

1   due process rights. (Doc. # 39 at 53.) Plaintiff was not allowed to proceed with a due process

2   claim relative to these allegations. (Doc. # 19 at 5-6.) Moreover, Plaintiff does not indicate he is

3   seeking summary judgment with respect to his retaliation claim in Count II at this time; nor does

4   he meet his burden for doing so under Rule 56. Defendants also fail to mention this claim in

5   either of their motions. Therefore, the court will not address this claim at this juncture.

6                                    **IV. RECOMMENDATION**

7           **IT IS HEREBY RECOMMENDED** that the District Court enter an order:

8           (1) **DENYING** Plaintiff's motion for partial summary judgment (Doc. # 39);

9           (2) **DENYING** Defendants' Cross-Motion to Dismiss Plaintiff's ADA and RA claims

10   (Doc. # 75); and

11          (3) **GRANTING** Defendants' Motion for Summary Judgment as to Counts III and IV.

12          None of the dispositive motions address the retaliation claim in Count II. Therefore, this

13   matter should proceed with respect to Plaintiff's ADA and RA claims as well as his retaliation

14   claim in Count II.

15          The parties should be aware of the following:

16          1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

17   this Report and Recommendation within fourteen days of receipt. These objections should be

18   titled "Objections to Magistrate Judge's Report and Recommendation" and should be

19   accompanied by points and authorities for consideration by the district judge.

20          2. That this Report and Recommendation is not an appealable order and that any notice of

21   appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

22   until entry of judgment by the district court.

23   DATED:  July 9, 2015.

24                                        _____
                                          WILLIAM G. COBB
25                                        UNITED STATES MAGISTRATE JUDGE

26

27

28

                                            - 33 -